The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioners Hoag and Taylor and the briefs and arguments before the Full Commission. The appealing parties have not shown good ground to reconsider the evidence, receive further evidence or to amend the prior Opinion and Award except for several modifications. The Full Commission therefore affirms the Opinion and Award of the Deputy Commissioner with modifications.
 ***********
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties prior to the hearing before the Deputy Commissioner in a Pre-Trial Agreement, at the hearing before the Deputy Commissioner and in a post-hearing stipulation as:
 STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. All parties are properly before the Industrial Commission, and the Industrial Commission has jurisdiction of the parties and of the subject matter. All parties have been correctly designated and there is no question as to misjoinder or nonjoinder of parties. No parties appeared in a representative capacity.
3. An employer-employee relationship existed between the parties on October 27, 1997.
4. Due to the nature of plaintiff's job, it is not feasible to produce a Form 22. The parties stipulate to plaintiff's income tax returns for 1997 and 1998 and agree to an average weekly wage of $2,868.31, which yields the maximum compensation rate for 1998 of $532.00 per week.
5. Plaintiff was out of work from July 6, 1998 to July 12, 1998 and from September 1, 1998 through December 14, 1998 and from April 16, 1999 through May 1, 1999 and from July 26, 2000 to present.
6. Plaintiff returned to work at lesser wages from July 13, 1998 to August 31, 1998, from December 15, 1998 through April 15, 1999 and from June 7, 2000 through July 25, 2000.
7. The parties stipulated into evidence a packet of medical records.
 ***********
Based upon all the competent evidence of record and the reasonable inferences therefrom, the Full Commission makes the following additional:
 FINDINGS OF FACT
1. Plaintiff is a 55-year-old male who on October 27, 1997 was employed by defendant-employer, an automobile dealership, as general sales manager. Plaintiff had been employed with defendant-employer for approximately nine years, for the first four years as a sales manager.
2. Plaintiff's duties as general sales manager included reviewing as well as occasionally negotiating purchase deals between customers and the dealership, hiring and training sales employees, coordinating between the service department and the body shop, handling almost all of customer relations and complaints, setting hearings with the Attorney General's Office for customers with lemon law complaints and handling of all advertising. Plaintiff had an advertising budget of $50,000.00 a month, and he decided which items to display on the ads depending on the time of year, themes, different finance programs, rebates and incentives. Plaintiff had approximately 33 people who reported to him including three finance and insurance managers, four desk managers, one used car manager and twenty-five sales people. The dealership sold approximately 200 to 225 cars per month and averaged approximately 100 customers visiting the facility daily. Currently two people share the responsibilities of general sales manager. In October 1997, plaintiff was working an average of 10 hours per day, six days a week, closing the dealership one night per week.
3. On October 27, 1997, plaintiff went to the service department to check on a vehicle for a customer, the cement floor of the service department was wet and plaintiff slipped. Plaintiff fell with his legs slipping from under him, landing on his side, hitting his elbow on the cement floor, his knee and then falling flat on his back. When plaintiff fell on his back, his neck jerked and his head hit the cement floor. Plaintiff may have lost consciousness and describes "seeing stars". Plaintiff was helped off the floor.
4. Plaintiff experienced immediate pain in his shoulder as well as his knee, hip and back. He went to First Med-Urgent Care where he was treated for injury to his knee, hip, back and shoulder. Plaintiff continued to experience pain, and a November 22, 1997 MRI of plaintiff's lumbar spine revealed degenerative disc disease at L5-S1 and a mild disc bulge at L5-S1 without evidence of disc herniation or nerve root impingement. Plaintiff was examined by Dr. Jaufman, a neurosurgeon, for back and lower extremity pain; surgery was not indicated. Plaintiff was treated by Dr. Broussard, an orthopedist, for his shoulder bursitis and knee contusion. Plaintiff was referred to physical therapy, which he underwent until March 1998, when he was instructed to perform those exercises at home. Plaintiff treated with Dr. Broussard from February 10, 1998 through April 14, 1998.
5. After his fall, plaintiff experienced problems with planning and organizing, concentration, short-term memory loss, inability to perform mathematical equations, insomnia, impulsiveness and irritability. Plaintiff was no longer able to work the numbers for the advertising, figure out lease payments or work negotiations. Plaintiff began to feel frustrated and would become overemotional, occasionally crying. Plaintiff also became increasingly irritable and temperamental. Plaintiff displayed a temper to employees that was uncharacteristic and became unable to deal with customer relations and complaints. Plaintiff sought assistance from other employees in dealing with customer relations, which he had previously handled exclusively.
6. Plaintiff was no longer able to supervise the same number of employees, could not train people and was unable to recruit new employees. Since plaintiff was unable to perform his job duties as before the accident, he had various people assist him in some of the tasks. Plaintiff did not inform these co-workers that he was having mental difficulties and found different excuses to have others finish tasks. Plaintiff hid his fears, insecurities and inabilities from his employer and other co-workers because he feared for his position and because this is characteristic behavior for those with the condition from which he was suffering. Plaintiff was not treated for a head injury immediately after his fall on October 27, 1997 and not until July 1998, as he was not aware that his problems with concentration, attention, calculations, social inappropriateness and emotional instability were related to hitting his head in the fall.
7. While in Wilmington for a visit in June 1998, plaintiff made application at a car dealership, interviewed with the managers and was offered a position. Plaintiff was offered a position as a sales manager which had less responsibility and a lower salary than the job he was performing with defendant-employer. Plaintiff made the decision to leave Fayetteville where he and his wife were well established and take a job for less pay, uprooting himself and his wife without consulting his wife.
8. Plaintiff began at Stevenson Honda in Wilmington immediately after he left defendant-employer and worked for approximately one and one half months before leaving the job there. Because of his compensable brain injuries, plaintiff was unable to handle the stress or duties of that job and his interpersonal/social skills were not appropriate.
9. Plaintiff attempted to start his own business wholesaling cars in Wilmington, where he would buy cars and then resale them for profit. This business failed. Plaintiff then worked for a Hyundai dealership in Lumberton, which had a slower pace than defendant-employer's dealership. Plaintiff had to drive one and one half hours each way to his job and the drive caused difficulty with his leg and back pain. Furthermore, plaintiff was not able to perform the job without help, made errors in calculations and had inappropriate social behavior. His supervisor informed him that it would not work out and plaintiff left that job.
10. Plaintiff was referred to Dr. David Bachman, a Wilmington neurologist, on August 4, 1998 for treatment of his back and leg pain. In that visit, plaintiff explained his problems with concentration and calculation. Dr. Bachman referred plaintiff to Christy L. Jones, a neuropsychologist, who performed an evaluation on November 9 and 10, 1998.
11. Results of plaintiff's evaluation were consistent with at least a mild closed head injury and post concussion syndrome. Plaintiff demonstrated frontal lobe functioning that fell below 95% of the population. This level of impairment explains plaintiff's impulsive and often destructive decision making. Plaintiff demonstrated difficulty in reversal of numbers. This was evident in both the assessment as well as in how plaintiff completed the general information sheet with his address and phone number. Plaintiff's performance on the evaluation was consistent with the mistakes he was making at his job, his impulsive career moves and behaviors at home and in social settings. Plaintiff's memory functioning fell below 84% of the population and his attention and concentration fell below 92% of the population. Plaintiff's personality evaluation suggested moderate levels of psychiatric distress, i.e. depression. His psychiatric overlay was consistent with a closed head injury. Plaintiff's profile in no way suggested malingering. On January 26, 1999, plaintiff underwent an independent medical examination performed by Dr. Thomas Gualtieri. Dr. Gualtieri was of the opinion that plaintiff has white matter disease and a mild brain injury with aggravated response due to the existing white matter disease. Although no brain MRI was performed to conclusively prove this diagnosis, if plaintiff does suffer from white matter disease, plaintiff's fall at work aggravated his symptoms. Again Dr. Gualtieri found no evidence that plaintiff was exaggerating his performance or that he was malingering. Plaintiff's results on the test performed by Dr. Gualtieri corroborated to results on those by Dr. Jones. Plaintiff has problems with sustaining attention, information processing and speech.
12. Dr. Jones referred plaintiff back to Dr. Bachman for chemotherapeutic treatment of depression. She recommended that plaintiff not begin interviewing for employment until his depression was treated and he had returned for reassessment in approximately four to five weeks. She further recommended that plaintiff be taught how to better inhibit his actions and to compensate for situations that are not structured. Dr. Jones was of the opinion that plaintiff needed a job with a significant amount of structure. Upon the recommendation of Dr. Jones, Dr. Bachman treated plaintiff with Paxil for his pain problems and depression. This provided improvement in plaintiff's emotional instability, his angry outbursts and his frustration. Plaintiff was also given Ritalin for his problems with attention and concentration and Aricept for his memory problems.
13. After reevaluating plaintiff, on September 24, 1999 Dr. Jones was of the opinion that plaintiff had reached maximum medical improvement in terms of his cognitive abilities, but not his psychiatric problems. Plaintiff continues to see Dr. Jones for psychotherapy sessions.
14. On July 17, 1998 through October 12, 1998, plaintiff treated with Dr. Friedman, a chiropractor, for his back and leg pain. Plaintiff experienced relief from these treatments. On September 2, 1998 an EMG/NCS revealed that plaintiff had L4 or L5 radiculopathy on the right with acute denervation changes only in the lower lumbar paraspinals.
15. Plaintiff's problems with his attention, concentration, emotionality, impulsivity and irritability are typical of someone who has suffered a closed head injury. Plaintiff can no longer work in sales. Plaintiff does not present himself well; he makes poor social plans, judgments and has poor social interactions. Plaintiff needs a very structured environment with little exposure to the public. Plaintiff is willing to work and indeed feels more useful when he is working. Plaintiff has made several unsuccessful trial attempts to work. Plaintiff recently purchased a computer franchise company. This company has so far lost money.
16. There is no evidence of record as to whether or not plaintiff has reached maximum medical improvement with regard to his shoulder, back and leg and what, if any, permanent impairment he retains.
17. On October 27, 1997, plaintiff suffered a compensable injury by accident when he slipped and fell hitting his head, leg, knee, shoulder and back on the cement floor.
18. As a direct and proximate result of his compensable fall and the resulting closed head injury, plaintiff was unable to engage in the activities required by his former job and was therefore justified in terminating that employment. As a direct and proximate result of his compensable fall and the resulting closed head injury, plaintiff was incapable after his injury of earning the same wages he earned before his injury in the same employment, was incapable after his injury of earning the same wages he earned before his injury in any other employment and plaintiff's incapacity to earn was caused by his injury.
19. From the time plaintiff left his employment with defendant-employer and continuing plaintiff has been unable to earn wages he was receiving at the time of his compensable injury at the same or in any other employment because of his compensable closed head injury.
20. The treatment plaintiff has received for his back, shoulder, leg and closed head injury, including psychotherapy, was reasonably designed to, and indeed did, effect a cure, give relief or lessen the period of disability.
21. As a direct and proximate result of plaintiff's compensable injury, he bears a substantial risk of requiring future medical treatment.
23. The medical testimony concerning plaintiff's closed head injury has greater weight than the lay witness testimony concerning plaintiff's behavior. Plaintiff's post injury behavior was far different than his pre-injury behavior.
24. This appeal was brought, in part, by the insurance carrier (self insured). The Full Commission by this Opinion and Award orders compensation to be paid to plaintiff. A reasonable fee to be awarded to plaintiff's counsel as part of the costs is $500.00.
 ***********
Based upon the foregoing stipulations and findings of fact the Full Commission reaches the following additional:
 CONCLUSIONS OF LAW
1. On October 27, 1997, plaintiff sustained a compensable injury by accident arising out of and in the course of his employment with defendant-employer when he hit his head, leg, knee, shoulder and back on the cement floor, suffering a closed head injury. N.C. Gen. Stat. §97-2(6).
2. Plaintiff's compensable injury resulted in a closed head injury, the sequella of which made plaintiff unable to perform his job duties and which made his termination of his employment with defendant-employer justified, as he was unable to perform the job.
3. As a direct and proximate result of plaintiff's compensable injuries, plaintiff was incapable of earning wages which he was receiving at the time of his compensable injury at the same or in any other employment since he terminated his employment with defendant-employer. N.C. Gen. Stat. § 97-29; Hendrix v. Linn-Corriher Corp., 317 N.C. 179,345 S.E.2d 650, cert. denied, 322 N.C. 835, 371 S.E.2d 277 (1988).
4. Plaintiff is entitled to compensation of $523.00 per week for the following stipulated periods when plaintiff was out of work because of his compensable injuries: from July 6, 1998 to July 12, 1998, from September 1, 1998 through December 14, 1998, from April 16, 1999 through May 1, 1999 and from July 26, 2000 to the date of this Opinion and Award and continuing. N.C. Gen. Stat. § 97-29.
5. Plaintiff is entitled to compensation of 2/3rds of the difference between his average weekly wage of $2,868.31 and his actual wages from July 13, 1998 to August 31, 1998 and from December 15, 1998 through April 15, 1999 and from June 7, 2000 through July 25, 2000, subject to a maximum compensation rate of $523.00 per week. N.C. Gen. Stat. § 97-30.
6. There is no evidence of record as to whether or not plaintiff retains any permanent impairment to his back, shoulder or leg. Plaintiff is not at MMI.
7. N.C. Gen. Stat. § 97-29 and § 97-31 are alternate sources of compensation for an employee who suffers a disabling injury which is also included as a scheduled injury. The injured worked is allowed to select the more favorable remedy but he cannot recover compensation under both sections. As plaintiff is continuing to have difficulty finding work, it is most probable that receiving benefits under N.C. Gen. Stat. § 97-29
and § 97-30 would provide plaintiff a more munificent remedy.McLeain v. Eaton Corp., 125 N.C. App. 391, 481 S.E.2d 289 (1997).
8. To the extent the same is reasonably designed to effect a cure, give relief or lessen the period of disability, defendant-employer shall pay all medical expenses incurred by plaintiff as a result of his compensable injuries including treatment for his back, shoulder, leg and head injury as well as psychiatric/psychological treatment. N.C. Gen. Stat. §97-25.
9. There is a substantial likelihood that plaintiff will require further medical treatment as a result of his compensable injuries. N.C. Gen. Stat. § 97-25.1.
10. Plaintiff's counsel is entitled to a reasonable attorney fee of $500.00 to be taxed as costs. N.C. Gen. Stat. § 97-88.
 ***********
Based upon the foregoing stipulations, findings of fact and conclusions of law the Full Commission enters the following:
 AWARD
1. Defendant shall pay to plaintiff compensation at the rate of $523.00 per week for the following stipulated periods when plaintiff was out of work because of his compensable injuries: from July 6, 1998 to July 12, 1998, from September 1, 1998 through December 14, 1998, from April 16, 1999 through May 1, 1999 and from July 26, 2000 to the date of this Opinion and Award and continuing. All amounts accrued as of the date of this Opinion and Award shall be paid in a lump sum, subject to attorney's fees as discussed below. Defendant shall pay to plaintiff interest on the accrued amount of compensation due, at the legal rate of interest provided in N.C. Gen. Stat. § 24-1. This amount is not subject to attorney's fees.
2. Defendant shall pay to plaintiff 2/3rds of the difference between his average weekly wage of $2,868.31 and his actual wages from July 13, 1998 to August 31, 1998 and from December 15, 1998 through April 15, 1999 and from June 7, 2000 through July 25, 2000, subject to a maximum compensation rate of $523.00 per week. All these amounts are accrued as of the date of this Opinion and Award and shall be paid in a lump sum, subject to attorney's fees as discussed below. Defendant shall pay to plaintiff interest on the accrued amount of compensation due, at the legal rate of interest provided in N.C. Gen. Stat. § 24-1. This amount is not subject to attorney's fees.
3. Defendant shall pay directly to plaintiff's counsel 25% of the compensation awarded in paragraphs 1 and 2 immediately above. After the lump sum compensation has been paid, defendant shall pay directly to plaintiff's counsel every fourth check.
4. Defendant shall pay all past and future medical expenses incurred by plaintiff as a result of his compensable injury including psychiatric and psychological treatment.
5. Defendant shall pay the costs, including an expert witness fee, which is HEREBY APPROVED, to Pamela H. Jessup, M. D. in connection with her deposition taken on June 23, 2000, and a $500.00 attorney fee to plaintiff's counsel pursuant to N.C. Gen. Stat. § 97-88.
This 13th day of July 2001.
 S/_____________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
 S/_______________ LAURA K. MAVRETIC COMMISSIONER